In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2741

FRANK TEESDALE, et al.,

*Plaintiffs-Appellees*,

*v.*

CITY OF CHICAGO, an Illinois
municipal corporation,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CV 4046—**William T. Hart**, *Judge*.

ARGUED MARCH 28, 2012—DECIDED AUGUST 10, 2012

Before MANION, SYKES, and HAMILTON, *Circuit Judges*.

MANION, *Circuit Judge*.

I.

Every July, St. Symphorosa Catholic Church in
Chicago holds a summer festival for several consecutive
days. The festival is open to the general public and no

admission fee is charged. To conduct the festival, the parish obtains a special event permit from the Mayor's Office of Special Events, pursuant to Municipal Code of Chicago, Illinois § 10-8-335 (2011). This permit allows the parish to close portions of two public streets adjacent to the church. The streets are closed to vehicular traffic, but are open to pedestrians. The festival is not sponsored by the City of Chicago—it is organized solely by St. Symphorosa.

For the 2008 festival, St. Symphorosa obtained a City permit running from July 6 through July 14. The parish provided a team of security personnel for the festival, which consisted of paid private security guards and volunteer off-duty Chicago police officers who were also St. Symphorosa parishioners. The head of St. Symphorosa's security team, Ray Kolasinski, was a parishioner and a member of the parish's festival committee. Kolasinski was also a Chicago police officer, but at the festival, he worked as one of the off-duty volunteers. His encounter with some unexpected visitors resulted in a lawsuit and ultimately this appeal.

Located a few blocks away from St. Symphorosa is Garfield Ridge Baptist Church, led by Pastor Frank Teesdale. Members of Garfield Church regularly travel to various events and locations throughout Chicago to engage in street ministry, which involves preaching to members of the public and handing out gospel tracts. In 2008, Garfield Church decided to attend the St. Symphorosa festival to engage in this street ministry.

On July 12, 2008, Pastor Teesdale and several members of his church entered the east end of the festival and

began walking down one of the blocked-off streets. Teesdale carried a bullhorn, while the other Garfield Church members carried signs and a banner with Scripture verses. The group engaged festival patrons in conversation and handed out gospel tracts.

Kolasinski was wearing a t-shirt that read "St. Symphorosa Police" and was armed with his gun and handcuffs. He approached Teesdale and told him that although he could preach at the festival, he could not use a bullhorn. Kolasinski also said that the group could not distribute literature without St. Symphorosa's permission. Teesdale then attempted to speak through the bullhorn. Kolasinski responded by taking Teesdale's arms, handcuffing them behind his back, and telling Teesdale that he was under arrest. Kolasinski walked Teesdale to the south entrance of the festival, followed by the other Garfield Church members. St. Symphorosa security called the police and asserted that they were holding an offender for criminal trespass. Teesdale was detained for approximately 30 minutes until two uniformed Chicago police officers arrived in a patrol car.

The officers were told by either Kolasinski or the St. Symphorosa business manager, Joseph Dillon, that Teesdale had been using a bullhorn and disturbing festival visitors, and that he had refused to leave when asked by security. At Kolasinski's direction, Dillon then signed a criminal complaint against Teesdale for trespass. Believing that the festival was a private event because the streets had been blocked off, the officers arrested Teesdale for trespass and brought him to the police

station. Teesdale was released on bond later that night. His trespass charge was eventually dismissed.

Nearly a year later, on July 6, 2009, the Garfield Church, Pastor Teesdale, and four other church members filed the current lawsuit against the City of Chicago, the two Chicago police officers who arrested Teesdale, and ten other "John Doe" defendants. In their suit, the plaintiffs alleged that the 2008 arrest violated their First Amendment rights and Pastor Teesdale's Fourth Amendment rights. The plaintiffs also argued that they were entitled to a declaratory judgment that would enjoin the City from preventing their attendance at future festivals. This lawsuit was filed just three days before the start of the 2009 festival.

The following day, the plaintiffs filed a motion for a temporary restraining order (TRO) and a preliminary injunction, requesting an order from the court safeguarding their right to attend the 2009 festival. The City hastily filed its response the next day on July 8, 2009. In its response, the City argued that the plaintiffs did not have an unlimited First Amendment right to preach at the festival, that St. Symphorosa could exclude the plaintiffs, and that the City had a "significant interest" in preserving St. Symphorosa's right to have its message heard instead of the plaintiffs'. In support of this legal argument, the City cited the United States Supreme Court decision of *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995). The City's legal argument on *Hurley* was incorrect, and ulti-mately, in hindsight, the City acknowledged that it was a

mistake. At that time, however, the district court did not rule on the plaintiffs' motion because of the imminence of the 2009 festival. Instead, the district court urged the parties to come to a temporary agreement allowing the plaintiffs to enter the festival on terms acceptable to both sides. The parties thus prepared a standby order, which the district court entered. This order permitted Pastor Teesdale and up to nine other Garfield Church members to enter the festival during specific hours with some limitations on the size of their signs and a prohibition on using a bullhorn or other sound-enhancing device. The parties abided by the standby order, and the 2009 festival passed without incident.

The case proceeded before the district court, and in March 2010, the district court dismissed some of the plaintiffs' claims, including their claim that the City had violated the plaintiffs' First Amendment rights during the incident at the 2008 festival. Notably, the district court ruled that at the time of the 2008 incident there was no evidence that the City had an official policy that violated the plaintiffs' rights. The case continued to discovery, however, on the claims that Pastor Teesdale's Fourth Amendment rights were violated by the 2008 arrest and that the plaintiffs' First Amendment rights at future festivals were being threatened.

In July 2010, the parties again prepared a standby order for St. Symphorosa's 2010 festival that was essentially identical to the standby order from the previous year. The district court entered the order, and the 2010 festival also passed without incident.

In January 2011, at the close of discovery, the parties filed cross-motions for summary judgment. On May 26, 2011, the district court issued its opinion, ruling for the City in part: The district court held that the 2008 arrest did not violate Pastor Teesdale's Fourth Amendment rights because the officers had probable cause to arrest Teesdale for disorderly conduct and were entitled to qualified immunity. This decision was not appealed. But the district court ruled against the City on the last remaining issue in the case, finding that the plaintiffs' First Amendment rights at future festivals were threatened by an official City policy. It is this latter ruling with which we are concerned.

The district court's decision was based on the City counsel's misguided legal argument in its July 2009 response to the plaintiffs' motion for a TRO. Relying on the United States Supreme Court decision in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995), the City then argued that the plaintiffs did not have an unlimited First Amendment right to preach at the festival and that St. Symphorosa could exclude the plaintiffs in order to preserve its message. The district court found that this legal position (which turned out to be inaccurate) constituted an official City policy that portended future violations of the plaintiffs' First Amendment rights. In support of this ruling, the district court noted that the City had not altered or amended its position articulated in its TRO response. As a result, it had failed to expressly state that it would not interfere with the plaintiffs' First Amendment rights. Moreover, the district court found that the only

reasonable inference from the City's willingness to enter into the 2009 and 2010 standby orders permitting the plaintiffs to attend the festival was that the City had not changed its position from July 2009, asserting that "[t]he clear implication of entering into standby orders only is that the City continues to contend it can lawfully stop plaintiffs' proposed expression." Consequently, the district court concluded that there was a "credible threat" that the City would enforce its stated policy and interfere with the plaintiffs' First Amendment rights. The district court thus entered a declaratory judgment against the City, ordering it to permit the Garfield Church members to enter any future St. Symphorosa festival. The district court's final judgment essentially adopted the terms of the two previous standby orders, authorizing the Garfield Church members to attend any future festival, with the same limitations as before: no bullhorn or other sound-enhancing device, a banner no larger than four feet by three feet, and non-pole signs no larger than three feet by two feet. The City then filed a motion for reconsideration, which the district court denied. The City appealed.

We heard the parties' oral argument on March 28, 2012. During the oral argument, counsel for the City made clear that the City does not take issue with the specific terms of the declaratory judgment. Rather, the City is concerned that its errant litigation position misled the district court when it held that the language in the City's pleading opposing the motion for a TRO recited an official policy for the City of Chicago. Counsel for the City also conceded during the oral argument that

the legal rationale of *Hurley* did not apply to the facts of this case and that the plaintiffs have a First Amendment right to attend festivals open to the public like that of St. Symphorosa.

Following the oral argument, the plaintiffs filed a motion to dismiss the appeal, arguing that the position taken by counsel for the City during the oral argument mooted the City's appeal. The plaintiffs argued that this case was only alive because of the City's previous litigation position—the litigation position based on *Hurley* that allegedly threatened the plaintiffs' First Amendment rights—and because the City had retracted this litigation position, the appeal was moot.

To some extent the plaintiffs are correct—there is no question that the City cannot prevent the plaintiffs from exercising their First Amendment rights at upcoming festivals. But what remains to be determined is the issue of whether the litigation position the City argued in its pleadings can constitute an official policy that gives rise to liability against the City under 42 U.S.C. § 1983. The district court concluded that the litigation position was the official policy of the City. If that was actually a City policy, then the plaintiffs arguably had a reasonable fear of future prosecution for engaging in protected speech and the district court properly entered a declaratory judgment against the City on that basis. But we must consider the merits of this reasoning, upon which the plaintiffs' standing depends.

II.

Despite the complicated factual and procedural background, the issue before us on appeal is simple: Does the City's legal argument made in its July 2009 TRO response constitute an official policy under *Monell* that gives rise to § 1983 municipal liability? We hold that it does not. A mere legal position, without anything more, is insufficient to constitute an official policy.

A plaintiff, like Garfield Church and its members, alleging a deprivation of his or her constitutional rights by a municipality, may bring an action against the municipality for declaratory or injunctive relief under 42 U.S.C. § 1983. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). To establish municipal liability, a plaintiff must show the existence of an "official policy" or other governmental custom that not only causes but is the "moving force" behind the deprivation of constitutional rights. *Estate of Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)); *see Monell*, 436 U.S. at 694. A plaintiff can establish an official policy through "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Estate of Sims*, 506 F.3d at 515 (citing *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007)).

In this case, the plaintiffs' claims are not based on the latter two possibilities: There are no allegations of other

arrests or a widespread City practice of violating First Amendment rights, and the plaintiffs are not alleging that the City's counsel were persons with final policy-making authority who caused a constitutional injury. Instead, the plaintiffs contend, and the district court agreed, that the legal argument made by the City in 2009 in its response to the plaintiffs' motion for a TRO constitutes an official policy under *Monell*.

As discussed above, the City's regrettable legal argument was based on the Supreme Court decision in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995), and stated that the plaintiffs did not have an unlimited First Amendment right to engage in street preaching at the festival and that St. Symphorosa could exclude the plaintiffs in order to preserve its message. Given the facts of this case, this legal argument is misguided. In *Hurley*, the Supreme Court ruled that a parade permitted on public streets was a First Amendment form of expression, and that parade organizers had the right to choose the content of the parade and to exclude conflicting messages. *Hurley*, 515 U.S. at 572-74. The St. Symphorosa festival is readily distinguishable from *Hurley* because it is not a parade or other form of First Amendment expression—it is a public festival, held on public city streets, free and open to all members of the general public. *See Startzell v. City of Philadelphia*, 533 F.3d 183, 194 (3d Cir. 2008) (finding that *Hurley* does not control "a private-sponsored event in a public forum that was free and open to the general public"). The city streets are a traditional public forum, and their character as a public forum is retained even though

they are used for a public festival sponsored by a private entity. Several of our sister circuits have clearly explained the non-applicability of *Hurley* in circumstances similar to those before us.[1]

Of course, a municipality is able to impose reasonable content-neutral time, place and manner restrictions on any traditional public forum.[2] Such restrictions would include, for example, prohibiting someone from using a

---

[1] *See Startzell v. City of Philadelphia*, 533 F.3d 183, 195 (3d Cir. 2008) ("There is no basis to read *Hurley* as circumscribing the long line of authority upholding free access by the general public to street festivals and other events held in traditional public fora."); *Parks v. City of Columbus*, 395 F.3d 643, 651-52 (6th Cir. 2005) (distinguishing *Hurley* and holding that "[t]he City cannot . . . claim that one's constitutionally protected rights disappear because a private party is hosting an event that remained free and open to the public"); *Gathright v. City of Portland*, 439 F.3d 573, 577 (9th Cir. 2006) ("We hold, however, that the policy of allowing permittees unfettered discretion to exclude private citizens on any (or no) basis is not narrowly tailored to the City's legitimate interest in protecting its permittees' right under *Hurley*.").

[2] *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (stating that in a traditional public forum, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." (internal quotation omitted)).

bullhorn during a public festival. Even without a bull-horn, a person is still able to express his message. But this minor restriction is far different from the categorical exclusion of a person engaged in street preaching based on the content of his speech. Such an exclusion would undoubtedly be unconstitutional. Accordingly, there can be no doubt that the City's counsel made an incorrect legal argument in its July 2009 response to the plaintiff's motion for a TRO and preliminary injunction.

The plaintiffs argue that a legal argument or a litigation position taken by a municipality can, by itself, constitute an official policy. But there is little case law in support of this position. At oral argument, the plaintiffs' counsel suggested that the most relevant case was *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). In that case, the Supreme Court held that "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483-84. The Supreme Court then applied that rule to the facts of the case, finding that there was municipal liability because a final decisionmaker with the authority to establish county policy (the County Prosecutor) chose a course of action and directed law enforcement to follow that course of action (to forcibly enter the petitioner's clinic, a violation of the petitioner's Fourth Amendment rights). *Id.* at 484-85.

But *Pembaur* is easily distinguishable from our case. In *Pembaur*, the Supreme Court deferred to a previous determination that the final decisionmaker, the County Prosecutor, had the authority to establish county policy. *Id.* at 484 n.13. Here, there is no indication that the City's attorneys who argued before the district court are final decisionmakers on behalf of the City. Certainly, the City's attorneys have the authority to represent the City in court and to make arguments on behalf of the City as its legal counsel, but that is not the same as being "responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483-84.

In addition, in *Pembaur*, the final decisionmaker made a definite choice to pursue a course of action, and in doing so, violated the petitioner's constitutional rights. In the case before us, the City's counsel made an incorrect legal argument in a responsive brief. This argument was made one day after the motion for a TRO was filed, and two days after the plaintiffs filed their case against the City. Giving the City the benefit of the doubt, perhaps this litigation position was taken quickly, without adequate preparation, and without a full understanding of the facts and circumstances of the case.[3] When the City filed its response, there was

---

[3] It is evident that the nature of case was also not fully understood by the plaintiffs at the time they filed their case, as they did not name St. Symphorosa Catholic Church as a defendant,

(continued...)

no evidence that the City had ever arrested anyone or otherwise acted according to this purported policy. And as the district court held, the City did not have an unconstitutional official policy during Pastor Teesdale's arrest in 2008. But based on the language recited in the City's 2009 response to the plaintiffs' motion for a TRO, the district court concluded that, as of 2009, there was an official policy of the City that threatened the plaintiffs' future First Amendment rights. We can understand how the district court was misled by the City's persistence in maintaining its errant position, but it was a mistake for the district court to assume that the City's legal argument was a statement of official City policy that would be applied in the future. Unlike the facts of *Pembaur*, the City did not deliberately choose "a course of action . . . from among various alternatives," *Pembaur*, 475 U.S. at 483, and then pursue it. Instead, the City's counsel made a legal argument in opposition to the plaintiffs' assertions that the City was liable under § 1983. Admittedly, this legal argument was deficient and counsel overstated the City's case. But even so, based on *Pembaur*, we hold that the City's improper legal argument is insufficient to constitute an official City policy that establishes municipal liability under § 1983.

In making its determination that the plaintiffs were entitled to a declaratory judgment, the district court also

---

[3] (...continued)

but sued the City and various individuals as City employees, incorrectly assuming that the City and City employees were responsible for the festival's security.

pointed to the City's failure to explicitly revoke and take a position contrary to its original *Hurley* argument as evidence that the City held an official policy that threatened the plaintiffs' First Amendment rights. Furthermore, the district court interpreted the City's willingness to enter into the 2009 and 2010 standby orders as evidence that the City intended to pursue its unconstitutional policy against the plaintiffs' First Amendment rights in the future. But we find that these two inferences fall well short of what is needed to determine that the City had an official policy. There are many excuses for why an advocate might not disavow an earlier litigation position until he or she is pressed to do so (as occurred during the parties' oral argument before this court). And in this case, it would not be appropriate to infer an official policy from a municipality's willingness to reach a temporary resolution of a dispute.

Besides the City's misguided litigation position, there exists no law, ordinance, code provision, or permitting requirement or regulation that the plaintiffs can identify that they might be found in violation of, and there are no previous instances of arrests or some other customary City practice that portends the future violation of the plaintiffs' rights. There is only the legal argument made by the City, which the City explicitly renounced during the oral argument. The plaintiffs took this renunciation as a reason to argue that the case was moot—but in actuality, it demonstrates the weakness of the plaintiffs' position and the fact that a mere legal argument is

too insubstantial to form the basis of municipal liability. Recall that under *Pembaur*, an official municipal policy is a deliberate choice to follow a course of action from among various alternatives made by officials with final policymaking authority and possibly giving rise to liability. It would be very unusual for an official municipal policy to be quickly changed by a lawyer who concedes during the course of litigation that the legal argument he is presenting is without merit when, for example, he is challenged on it by a judge.

Under Article III of the United States Constitution, federal jurisdiction is limited to actual cases and controversies. *Goldhamer v. Nagode*, 621 F.3d 581, 584 (7th Cir. 2010); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). To establish standing in a case where the plaintiffs are bringing a pre-enforcement challenge to an alleged policy and are seeking prospective relief, "the plaintiffs must show that: (1) they are under threat of an actual and imminent injury in fact; (2) there is a causal relation between that injury and the conduct to be enjoined; and (3) it is likely, rather than speculative or hypothetical, that a favorable judicial decision will prevent or redress that injury." *Goldhamer*, 621 F.3d at 585. As we have said above, besides the City's misguided litigation position—which we hold is insufficient to constitute an official City policy—the plaintiffs cannot point to any ordinance, regulation, or policy that threatens their First Amendment rights. The threat of arrests is therefore speculative, and the facts are inadequate for the plaintiffs to establish standing. *See Goldhamer*, 621

F.3d at 586 ("[T]o present a justiciable controversy, the person must assert more than a wholly speculative possibility of criminal consequences.").[4]

We acknowledge the great importance that our society accords to freedom of speech and the free exercise of religion, and that the plaintiffs' legitimate rights to such freedoms are to be respected. Like any other member of the public, the plaintiffs can exercise their rights at future public festivals, subject to reasonable time, place, and manner restrictions. But under the particular facts of this case, there is no evidence of an official City policy that threatens the plaintiffs' First Amendment rights, giving rise to municipal liability and entitling the plaintiffs to a declaratory judgment. A mere legal pleading or a litigating position, with nothing more, is insufficient to constitute an official policy under *Monell*. Without such an official policy, these plaintiffs do not have

---

[4] In its opinion, the district court cited *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (U.S. 2010), for the proposition that, because the City has not stated that the plaintiffs will not be prosecuted, a credible threat to the plaintiffs remains. *See id.* at 2717. But *Holder* is easily distinguishable from the facts before us: In *Holder*, there was an actual statute that the government had used as a basis to charge 150 persons. *Id.* In our case, there is no previous history of arrests and there is no ordinance, regulation, or other official municipal policy that the City might use as a basis for prosecuting the plaintiffs.

standing to obtain the declaratory judgment. The plaintiffs' motion to dismiss the appeal as moot is DENIED, the judgment of the district court is VACATED, and the case is REMANDED for dismissal on jurisdictional grounds based on lack of standing.