In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1464

KRYSTAL WILSON,

*Plaintiff-Appellant*,

*v.*

COOK COUNTY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08-C-587— **Sharon Johnson Coleman**, *Judge.*

ARGUED JANUARY 9, 2014 — DECIDED FEBRUARY 10, 2014

Before MANION and SYKES, *Circuit Judges*, and GRIESBACH,
*District Judge.*[*]

GRIESBACH, *District Judge*. Krystal Almaguer (now Wilson),
an out-of-work massage therapist, interviewed for a position
at Oak Forest Hospital, a part of the Cook County Bureau of
Health Services. Unfortunately, the job existed only in the

[*] Of the Eastern District of Wisconsin, sitting by designation.

mind of Felice "Phil" Vanaria, a politically-appointed staffer at
the hospital who had no authority to interview or hire appli-
cants, much less create positions. Vanaria used the promise of
the phony job to convince Almaguer to give him erotic
massages and engage in sexual contact. After Almaguer
discovered the ruse and called the police department, she
brought this action against Cook County under Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Equal
Protection and Due Process Clauses of the Fourteenth Amend-
ment. She also alleged state law torts. The district court
granted summary judgment to Cook County, and we affirm.

## I.

Between 1984 and 1998, Felice Vanaria was employed by
the Cook County Adult Probation Department, a unit of the
Circuit Court of Cook County under the supervision of the
chief judge. During that period, Vanaria was involved in
several incidents in which female probationers alleged he had
sought sexual favors in exchange for looser conditions of
probation. Following an investigation, Vanaria's employment
was terminated. He spent the next four years working at a
casino.

In 2002 Cook County Commissioner Joseph Moreno hired
Vanaria, who had a history as a political operative, to be an
administrative assistant. Moreno testified that he did not
conduct employment checks on his own but relied on county
human resources staff to conduct criminal background checks.
He further stated that the most important qualifications for
employees were loyalty and the ability to do the job they were
required to do, and Vanaria had proven himself to be a loyal

and effective political operative and fundraiser. Vanaria worked for Commissioner Moreno for nearly two years, and during that time there were no complaints about misconduct.

In late 2004 Commissioner Moreno recommended Vanaria for a job at the county's Oak Forest Hospital, and Vanaria began working there in 2005. Like Vanaria's previous job with Moreno, the position was a *Shakman* exempt position, meaning that it was excluded from the decrees prohibiting the county from making hiring decisions based on politics. *See United States v. Del Valle*, 674 F.3d 696, 698-99 (7th Cir. 2012); *Shakman v. Dunne*, 829 F.2d 1387, 1389 (7th Cir. 1987). This meant that rather than applying for the job through a typical competitive application process at the hospital itself, Vanaria obtained the job through the patronage of Commissioner Moreno and County Board President Todd Stroger. Although Vanaria was subject to fingerprinting, the investigation giving rise to his 1998 termination from the Adult Probation Department did not come to light during the hiring process. In fact, taking the facts in the light most favorable to Almaguer, it appears that the hospital was not even involved in the hiring process but was instead simply told that Vanaria would be working there. The hospital's human resources director explained that the hospital did not conduct independent background investigations of political patronage hires.

Vanaria's position at the hospital involved coordinating continuing education programs for physicians and staff. In 2005, a representative for the Eli Lilly & Co. pharmaceutical company alleged that Vanaria had attempted to condition her participation in one of these programs on her giving him a massage. An investigation resulted in oral counseling for

Vanaria and an order to stay away from the representative, but no discipline.

In January 2007, after a referral from a mutual acquaintance, Vanaria called Krystal Almaguer to inquire about massage services. The conversation eventually turned to employment (Almaguer was unemployed at the time), and Vanaria suggested that there might be some positions at the hospital for which she would be qualified. The same day, Almaguer went to the hospital to provide Vanaria with a résumé. Without conducting a traditional interview, Vanaria offered her a $52,000-a-year position as a physical therapist. When she alerted Vanaria to the fact that she was not qualified as a physical therapist (she lacked the requisite degree and license), he explained that he could make things happen because certain people owed him favors. He also stated that he could get in trouble for getting her the job.

Vanaria's ruse proved comprehensive and convincing. During his meeting with Almaguer, he provided her with legitimate application forms and insurance paperwork, and he had her fill out a consent form for fingerprinting. Thus, apart from the alacrity and informality of the process, the meeting had many of the hallmarks of a *bona fide* job interview. On February 1, 2007, at Vanaria's request, Almaguer returned to his office with copies of her Social Security card and birth certificate. At this second meeting, Vanaria asked Almaguer to close the door to his office. He then instructed her that if she truly wanted the job, she had to kiss and massage him. Ultimately she removed her clothes, and Vanaria kissed her.

Later, after some hesitation about accepting the position, Almaguer eventually agreed to have Vanaria visit her at her home massage studio. There, the two removed their clothes and Almaguer acceded to Vanaria's wish that she manually stimulate him.

In an effort to prolong the unfortunate scheme, the next week Vanaria enlisted a female friend to pose as an HR employee and call Almaguer about a change in the position being offered. Vanaria explained that the new position would pay $10,000 more but would require Almaguer to give him another massage. This development was apparently enough to arouse Almaguer's suspicions, because she immediately called the hospital's HR department. When the HR department informed her that no such position had ever existed, Almaguer enlisted the help of the Orland Park Police Department. Vanaria eventually pled guilty to charges of official misconduct and bribery. This lawsuit against Cook County followed.

The district court initially granted summary judgment in favor of Cook County on the Title VII claim, as well as all of the state law claims, which the court had supplemental jurisdiction over pursuant to 28 U.S.C. § 1367 (and which are not before us on appeal). The court denied summary judgment as to the equal protection and due process claims. The court subsequently granted Cook County's motion for reconsideration and entered judgment on all of the claims. This appeal of the federal claims followed.

## II.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We review the district court's decision to grant summary judgment *de novo*, and generally will construe all facts and reasonable inferences in the light most favorable to the non-moving party. *Arizanovska v. Wal–Mart Stores, Inc.*, 682 F.3d 698, 702 (7th Cir. 2012).

A. Equal Protection

In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978), the Supreme Court held that a government agency may be liable when its official policy or custom inflicts the plaintiff's injury. But "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403 (1997). Instead, to "establish municipal liability, a plaintiff must show the existence of an official policy or other governmental custom that not only causes but is the moving force behind the deprivation of constitutional rights." *Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012) (internal quotation marks omitted).

In support of her equal protection claim Almaguer argues that Cook County's policy of not responding to sexual harassment complaints was the cause of her constitutional injury. The district court originally sided with Almaguer, noting that by continuing to employ Vanaria despite the extensive history of misconduct, a jury could find that Cook County created the highly predictable risk that he would engage in sexual misconduct again. On reconsideration, however, the district court accepted the county's argument that employees of the Adult

Probation Department, from which Vanaria had been termi-
nated in 1998, were state, rather than county, employees. It
followed that because Vanaria had been a state employee
during the period of his most egregious sexual misconduct, the
*county's* oversight and knowledge of Vanaria's activity was
much more limited than originally thought. Since Almaguer
could now point only to a single act of failing to address
Vanaria's sexual misconduct—the 2005 incident with the Eli
Lilly representative—the district court concluded Almaguer
was unable to establish any kind of official policy or practice on
which to hang municipal liability.

Almaguer does not challenge the district court's conclusion
that Vanaria was not a county employee while working as a
probation officer. Although his behavior as a probation officer
does not directly speak to any of Cook County's practices or
policies during that time period, Almaguer argues that the
county's treatment of Vanaria's behavior *after* he was hired at
the hospital suffices to show that the county had a permanent
and well-settled policy of turning a blind eye to sexual miscon-
duct.

Almaguer analogizes her case to *Bohen v. City of East
Chicago, Ind.*, where this court recognized that sexual harass-
ment "constitutes sex discrimination in violation of the equal
protection clause and is actionable under § 1983." 799 F.2d
1180, 1185 (7th Cir. 1986). There, a female emergency dis-
patcher was subjected to pervasive sexual harassment by other
firefighters, including supervisors. We concluded that "sexual
harassment was the general, on-going, and accepted practice
at the East Chicago Fire Department, and high-ranking,
supervisory, and management officials responsible for working

conditions at the department knew of, tolerated, and partici-pated in the harassment." *Id.* at 1189. As such, this court concluded that the plaintiff had stated a claim against the city based on its established policy or custom.

Almaguer cites the 2005 incident between Vanaria and the Eli Lilly representative as evidence that the county had a policy or practice of inadequately investigating sexual harassment claims. But the hospital investigated that incident and directed Vanaria to stay away from the representative. She also makes much of the fact that after her allegations came to light, the county did not immediately terminate his employment. These few incidents do not come close to establishing the kind of pervasive custom that would give rise to liability under *Bohen* and *Monell*. Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice. *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Gable v. City of Chi.*, 296 F.3d 531, 538 (7th Cir. 2002) and *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988)).

Municipalities may be found directly liable only when their own policy or custom is the "moving force" behind the deprivation. *Teesdale,* 690 F.3d at 833. Here, it is clear that the moving force behind the harassment was Vanaria, not Cook County. Accordingly, like the district court, we conclude that Almaguer cannot establish that she suffered any equal protec-tion injury at the hands of Cook County.

B. Due Process

As set forth above, sexual harassment claims brought under § 1983 are traditionally analyzed in the context of the Equal Protection Clause. However, the substantive component of the Due Process Clause may also come into play when a plaintiff alleges that her bodily integrity was violated by a state actor. *Wudtke v. Davel,* 128 F.3d 1057, 1063 (7th Cir. 1997). Here, Almaguer argues that Cook County's practice of failing to screen political employees caused her to suffer a violation of her due process right to bodily integrity.

Cook County first argues that Almaguer did not suffer any due process injury because her bodily integrity was compromised not by the county but by her own decision to trade sexual favors for a chance at an attractive county job for which she was grossly unqualified. Almaguer was not assaulted or coerced; she was a willing participant who acceded to Vanaria's directives so long as the prospect of a job loomed large. She did not call the police when the sexual activity was proposed, nor even when it occurred. It was only when she realized that she would not be receiving her end of the bargain that she involved the authorities. Given her voluntary participation in the *quid pro quo* scheme, Cook County argues that Almaguer cannot be said to have experienced any infringement of her due process rights.

Almaguer counters that her case is like *Wudtke v. Davel, supra,* 128 F.3d at 1059, where a school superintendent allegedly threatened a schoolteacher by refusing to approve the renewal of her teaching license, and by otherwise making her job much more difficult, unless she engaged in sexual acts with

him. That analogy might prove to be a difficult one. It is an interesting question whether sexual contact extorted by a current supervisor is fundamentally different than sexual activity attained by promises of providing a job. But consideration of these distinctions will have to wait for another day because the county did not make this argument during district court proceedings, and thus it is waived on appeal. *Frey Corp. v. City of Peoria, Ill.*, 735 F.3d 505, 509 (7th Cir. 2013).

Finding the issue waived, we will assume that Almaguer suffered an injury to her bodily integrity and will focus, as the parties and district court did, on the questions of whether Cook County caused that injury and whether it possessed the requisite culpability. To reiterate, in order to "establish municipal liability, a plaintiff must show the existence of an official policy or other governmental custom that not only causes but is the moving force behind the deprivation of constitutional rights." *Teesdale*, 690 F.3d at 833 (internal quotation marks omitted).

We begin by noting the Supreme Court's counsel that "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 405. In *Canton v. Harris*, the Supreme Court held that to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights, a plaintiff must demonstrate that the municipal action was taken with "deliberate indifference" to its known or obvious consequences. 489 U.S. 378, 388 (1989).

Deliberate indifference means that the municipality knows or should know that consequences will ensue because those consequences were an obvious result of its conduct. "A showing of simple or even heightened negligence will not suffice." *Brown*, 520 U.S. at 407.

Here, we are not satisfied that Vanaria's history of sexual misconduct was so egregious and pervasive that what happened to Almaguer was an obvious result of hiring Vanaria as an administrative assistant. Our conclusion rests on an examination of Vanaria's own conduct, both in the past and with respect to Almaguer, and it also requires us to consider the nature of the position the county hired him to fill.[1]

To recall, the most troubling conduct Vanaria engaged in, so far as we know, was the coercion of female probationers who were under his supervision. That occurred during the 1990s, and resulted in his termination in 1998. During the ensuing seven years, Vanaria was employed, apparently without incident, at a casino and with Commissioner Moreno beginning in 2002. With Moreno's support, Vanaria moved to the hospital in 2005.

Thus, had the county conducted a thorough background examination prior to allowing Vanaria to work at the hospital, it would have uncovered the fact that he had engaged in grossly inappropriate conduct as recently as seven years

---

[1] In cases like this the questions of causation and deliberate indifference often overlap. As the Supreme Court has noted, the question of the predictability of the injury speaks to the municipality's mental state as well as to whether the hiring decision itself was the cause of the plaintiff's injury. *Brown*, 520 U.S. at 409-10.

earlier. However, it would also have learned that there had been no incidents during the most recent seven-year period of his employment. Given the passage of time without incident and the fact that Vanaria had aged seven years, it is difficult to conclude that Vanaria's misconduct with respect to Almaguer was so obvious that any jury could find causation or deliberate indifference. No doubt Vanaria was more likely to commit sexual misdeeds than someone without his checkered history, but we must recognize that individuals are capable of growth and not necessarily doomed to a life of recidivism. And given that Vanaria was fired from his state position in 1998, it is not implausible to believe that he would have learned from his errors and decided that another infraction would have caused his political support to dry up. Almaguer's argument is more persuasive with the benefit of 20/20 hindsight, but of course we must view things from the perspective of the hospital at the time it hired Vanaria. In 2005, it was far from obvious that he would engage in sexually inappropriate conduct with a complete stranger.

Our conclusion is bolstered by a comparison of Vanaria's past conduct with the behavior he exhibited toward Almaguer. Vanaria's *modus operandi* had been one of abuse of power. As a probation officer, he had attempted to trade favorable probation conditions for sexual favors, and his position of supervisory power was what made his proposals possible. By contrast, Vanaria did not exercise any legitimate power over Almaguer. As detailed above, he was able to entice Almaguer through a ruse he concocted, but the manner in which he operated was a sharp deviation from his past misconduct. That is, even if the county had known about his probation history,

it could hardly have expected that Vanaria would have impersonated a human resources employee and lured a complete stranger into the building. He had no history of such conduct. In *Brown* the Supreme Court made clear that it is not enough that a municipality know an employee would be likely to violate a plaintiff's constitutional rights in some kind of general sense: "a finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." 520 U.S. at 412. In other words, a plaintiff must connect the dots between the past conduct and the specific constitutional violation. Vanaria's past conduct involved a straightforward abuse of power, whereas in this case his weapon was not power but trickery and lies. Although the acts against Almaguer obviously share some similarities with Vanaria's past conduct—all incidents involve bartering for sexual favors—the lengths he went to in order to dupe Almaguer, someone over whom Vanaria had no legitimate power, do not find a comfortable place within the predictable arc of his past conduct.

Finally, and relatedly, we believe it is important to consider the position into which Vanaria was actually placed. Had Cook County hired Vanaria for a job in which he supervised or exercised power over large numbers of women, its liability might be a different story. As noted above, Vanaria's *modus operandi* was to exploit the power the government vested in him and to leverage that power to obtain sexual favors from people he supervised. Here, however, the hospital hired him as an administrative assistant with responsibility for managing

continuing education for physicians and other staff. As far as
we can tell, Cook County did not vest *any* power in him: he
had no power over other employees and no official reason to
interact with job seekers like Almaguer, much less exercise
power over them. Until 2007, he had never (so far as anyone
knew) impersonated a human resources employee and *created*
a phony position of power out of whole cloth in order to trick
unsuspecting citizens. The county did not clothe him in hiring
authority—all it did was give him the same kind of access to an
office, standard business forms, and the like, that presumably
many other white collar hospital employees would have. As
the county's attorney said during oral argument, Vanaria was
essentially an imposter. Thus, even if some kind of sexual
misconduct would have been predictable had the county
placed Vanaria in a position of power, the county could not
have imagined that Vanaria could have pulled off the scheme
he did while toiling as an administrative assistant with such a
modest portfolio.

In sum, we take the Supreme Court seriously when it
instructs us to be wary of imposing municipal liability in
circumstances like this. "Where a plaintiff presents a § 1983
claim premised upon the inadequacy of an official's review of
a prospective applicant's record … there is a particular danger
that a municipality will be held liable for an injury not directly
caused by a deliberate action attributable to the municipality
itself." *Brown*, 520 U.S. at 410. Thus, the bar is set high in terms
of both culpability (deliberate indifference) and causation,
whereby a plaintiff must link the hiring decision to the particu-
lar injury alleged. In our view, imposing liability on Cook
County under these facts would substitute conjecture and

principles of mere negligence for the "rigorous standards of culpability and causation" the Supreme Court has imposed. *Id.* at 405. Simply put, it is too much of a stretch to say that the county not only should have known Vanaria would commit various sexual misdeeds, but that he would also invent a phony position of power that would allow him to violate the bodily integrity of someone he had no business reason to come in contact with. *See Williams v. Berney,* 519 F.3d 1216, 1223 (10th Cir. 2008) (city license inspector did not violate substantive due process when assaulting citizen because the use of force was outside the scope of authority given him by the city).

Our conclusion means two things. First, it means that the decision to hire Vanaria was not the cause of Almaguer's injury in anything but the "but for" sense. *Brown*, 520 U.S. at 410. It was not, in other words, the "moving force" behind the injury. *Monell*, 436 U.S. at 694. Second, and relatedly, it means that the county lacked the requisite mental state of deliberate indifference. For these reasons, we conclude the substantive due process claim was properly dismissed.

C. Title VII

Finally, Almaguer alleges that Cook County violated Title VII, 42 U.S.C. § 2000e, *et seq.*, when it allowed Vanaria to condition employment at the hospital on acquiescence to his sexual requests. The district court granted summary judgment to the county because Almaguer had not established the existence of any kind of employment relationship, a prerequisite to proceeding under Title VII.

Almaguer argues that the district court erred because she may proceed under Title VII as a *prospective* employee. That is,

there need not be an established employer/employee relationship before Title VII is implicated. Almaguer is correct, as far as that goes. Section 2000e-2(a) states that an employer engages in unlawful employment practices if it fails or refuses to hire an individual because of that individual's race, color, religion, sex or national origin. 42 U.S.C. § 2000e-2(a). By its own terms, then, applicants for employment positions are afforded protection against discriminatory hiring decisions even before the employment relationship has been established.

But the district court's decision did not rest on the mere fact that Almaguer was not a county employee at the time of Vanaria's conduct. Instead, the district court seems to have concluded that there was no employer/employee relationship at all, whether past, present or prospective. Section 2000e-2(a)(1), on which Almaguer relies, governs "unlawful employment practices," and thus before it is implicated there must be *some* kind of "employment" relationship. 42 U.S.C. § 2000e-2(a)(1). A prospective relationship will suffice: no one doubts that a prospective employee may bring a Title VII claim if she alleges she was denied a position on the basis of her sex. But here the story is much different—in our case, there was no position of employment at all. Section 2000e-2(a)(1) prevents the employer from refusing to hire someone because of sex. 42 U.S.C. § 2000e-2(a)(1). Even if Vanaria's conduct could be attributed to the employer here, he did not "refuse to hire" Almaguer for the simple reason that he was wholly unable to hire her at all. *Id.* To proceed on a refusal-to-hire claim, a plaintiff must at a minimum establish that she suffered some adverse employment action, namely, that she was passed over for a job. *See Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504

(7th Cir. 2004) ("Whether the plaintiff proceeds by the direct or indirect method of proof, [s]he must show a materially adverse employment action.") (citing *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 691 (7th Cir. 2001)); *Alexander v. Casino Queen, Inc.*, —F.3d —, 2014 WL 57947 (7th Cir. Jan. 8, 2014). When no job exists, the plaintiff cannot be said to have suffered any adverse employment action. *Jackson v. County of Racine,* 474 F.3d 493, 501 (7th Cir. 2007)("It is important to distinguish between the real loss of a promotion (a tangible action) and the disappointment that follows when it turns out that there is no tangible benefit available at all and that the supervisor has been lying in order to win sexual favors.") In short, the county did not refuse to hire Almaguer because of her sex; it refused to hire her because there was no position for a massage therapist at the hospital. It was not hiring *anyone*.

Accordingly, although we agree with Almaguer that a plaintiff need not be presently employed by an employer to invoke Title VII, a plaintiff must at least have been passed over for a job that actually existed before she can claim an "unlawful employment practice" has occurred under 42 U.S.C. § 2000e-2(a)(1).

### III.

We cannot, of course, condone the conduct of the Cook County employee who attempted to secure sexual favors in exchange for a job that didn't exist. Nor do we believe that Cook County's method of filling positions through patronage is a model worthy of the civics books. Yet neither can we find that Vanaria's conduct is attributable to his employer, the county. Nor can we find the requisite employment relationship

required by Title VII. Accordingly, the judgment of the district court is affirmed.